Judge Carr:
This is a case of probate. In the County Court of Campbell, the two sons of Samuel Scott, who were appointed executors in a paper purporting to be his will, offered it for proof in the usual course. The probate was opposed by his sons-in-Iaw. The Court decided, that at the time of executing the will, the testator was of sound and disposing mind and memory, and under no undue influence. They therefore ordered the writing to be recorded as his last will and testament. An appeal was taken from this decision to the Superior Court of Law for the county. There, after the examination of very many witnesses, the judgment of the Court below was affirmed. Upon the correctness of that affirmance, we are now to decide.
*400 In the argument of this cause, the counsel for the appellants made three points. 1. That the testator was incompetent to the making a will. - 2. That it was made under undue influence. 3. That the Superior Court erred in excluding evidence of the declarations of the testator’s wife, as to his incapacity.
In discussing the competency of the testator, a wide scope was taken, embracing the last twelve years of his life; and I understood the counsel for the appellants to lay it down, as a general rule, that it was incumbent on the devisee claiming under a will, to prove the sanity of the testator: that the onus was upon him, in every question of this sort. Taken in this latitude, I do not consider the position correct. The natural presumption is, that every man is sane and competent to make a will, and this presumption must stand, until destroyed by proof on the other side. To say that insanity must be presumed, until sanity be proved, would seem to be saying that insanity is the natural state of the human mind. In the Attorney General v. Parnther, 3 Bro. Ch. Ca. 441, Lord Thurlow says, “ The course of procedure, for the purpose of trying the state of the party’s mind, allows of rules. If derangement be alledged, it is clearly incumbent on the party alledging it, to prove such derangement. If such derangement be proved, or be admitted to have existed at any particular period, but a lucid interval be alledged to have prevailed at the period particularly refeiTed to, then the burthen of proof attaches on the party alledging such lucid interval, who must shew sanity and competence at the period when the act was done, and to which the lucid interval refers.” This case is referred to by the subsequent Judges and writers, as containing the correct and clear rule on the subject. - Thus in White v. Wilson, 13 Ves. 87, Lord Eldon says, “ The rule upon this subject of lunacy has never been so distinctly stated, as by Lord Thurlow in the Attorney General v. Parnther, to wit, where a party has ever been subject to a commission, or to any restraint permitted by *401 ¡aw, even a domestic restraint, clearly and plainly imposed upon him, in consequence of undisputed insanity, the proof of shewing sanity is thrown upon him. On the other hand, where insanity has not been imputed by relations or friends, or even by common fame, the proof of insanity, which does not appear to have ever existed, is thrown upon the other side, which is not to be made out by rambling through the whole life of the party, but must bo applied to the particular date of the transaction.” In 9 Ves. 611, it is laid down by the Master of the Rolls, that if genera] lunacy be established, the opposite party is under the necessity of shewing, that there was a restoration of the faculties of the mind, at the time of the particular act. This certainly seems the rule of reason, as well as law. The remark of Lord Eldon, that a case of insanity is not to be made out by rambling through the whole life of the party, but must be applied to the particular date of the transaction, is unquestionably true as a general position. The same law is very strongly laid down by Lord Camden, in Hinson v. Kersey, 4 Burn’s Eccles. Law, 88, cited by Phillips, 431. He says, “the great question in such cases is, whether the testator was in his senses when he made the will; and consequently, the time of the execution is the critical moment, which requires guard and protection. What is the employment of the witnesses ? It is to inspect and judge of the testator’s sanity, before they attest; and if he is not capable, they ought not to attest. In other eases, the witnesses are passive; here they are active, and the principal parties to the transaction. The testator is entrusted to their care.” In the ease before us, the three subscribing witnesses testify clearly and explicitly as to the sanity and capacity of the testator; and their characters are not in the slightest degree impeached. But it is said, that this case is an exception to the general rule: that here, the testator, by the visitation of paralysis, was so prostrated, both in body and mind, as to be, unquestionably for a time, incapable of making a will: that the doubt is, whether he *402 ever so far recovered his mind, as to be able to make a valid will; and that to .ascertain this,'we ought not to select any one moment of time, but to pass in review the whole per'°dj from the paralytic stroke to the date of the will. I think there is much reason in these suggestions; though I cannot agree that the effects of paralysis on the mind, (from Doctor Cabell’s account of the disease,) will authorise us to consider this case, as on exactly the same ground with those, where actual derangement, or what the cases call general lunacy, has been established. It is a curious fact, shewing very strongly the uncertainty of evidence depending on mere recollection, that it is a doubtful point on the record, whéther the paralytic stroke occurred in 1810 or 1812. My own opinion is, that it was in 1810; and I rest it principally upon the evidence of Doctor Cabell, the attending physician. There are four others who agree with him; Taylor, the overseer, Roy, the nephew of Mrs. Scott, Robert Scott, the testator’s nephew, and Chilton. I rely most on Doctor Cabell, for this reason; he was examined first, and testified, that to his best recollection, the stroke was in 1810. When this point was found to be questioned, he recurred to his books, and found the entry of his visit dated the 10th of April, 1810; and he says it was his constant habit to make those entries as soon as he returned from the visit. Here we have something like certainty, something to fix the fact, and test the wavering recollections of faithless memory. There are a good many witnesses, and some facts, tending to contradict this statement; but they are not sufficient to counterbalance it in my mind. But this point, though earnestly discussed in the argument, does not seem to me of importance. Take it that the paralytic stroke was in 1810; then there are many proofs of sanity and capacity, both bodily and mental, in that and the succeeding year; such as the frequent visits of the testator to the court-house; his sitting on the bench in November, 1810, and every month in 1811; his riding about his farm; his purchasing land, and attending to super *403 intend and direct the running of the lines, &e. Adopt the hypothesis that the attack was in 1812, after the testator’s qualification as high sheriff; then you admit the will made in 18^0, to be above all exception, oh the score of capacity or influence, a clear and fair expression of the settled purpose of the testator, as to the disposition of his property at that day; and by a comparison of that will with the last will, you find a striking coincidence—the same general features—the same arrangement of property;—and (with a few variations, growing out of the changes produced by the lapse of ten years,) almost the same provisions in favor'of the different devisees and legatees. Indeed, it is remarkable, that in all the four wills produced, the general outlines are pretty much the same; the property generally, to the mother during life; the lands, to the sons; certain slaves, with their share of the residue, to the daughters; and this general plan is further proved to have been the settled purpose of the testator’s mind, by Mrs. Ann Scott, Bop, and Chilton, who say that the disposition of his property was always a favorite topic with him, and that in conversations, long before his attack, they have heard him say that he intended his lands for his sons, and money for his daughters. But leaving these general remarks, let us descend to a more particular examination of the evidence, touching the capacity of the testator, during the time intervening between the paralytic stroke and the will. The testimony is of two kinds; 1st, the mere opinions of witnesses; 2d, the detail of the conversations and actions of the’testator.
The opinion of a witness, as to the sanity of a person, depends, for its weight, on the capacity of the witness to judge, and his opportunity. Physicians are considered as occupying a high grade on such questions, both because they are generally men of cultivated minds and observation, and because, from the course of their education and pursuits, they are supposed to have turned their attention more particularly to such subjects, and therefore, tcAio able *404 to discriminate more accurately; especially a physician who jjas at|;en¿[e(j the patient through the disease, which is supposed to have disabled his mind. In this case, we have the evidence of two physicians, Doctors Cabell and Stevens. The first is known to general fame, as having been most eminently skilful in his profession. He was the family physician of Major Scott, called in at the time of the attack, attended him through the disease, and continued his physician till his death. He says that the patient was much prostrated, both in body and mind, by the stroke: that this continued for a year or longer'; after which, he recovered his mind, and was sound and capable, except when intoxicated, and during the fever in his last illness. From 1810 to 1822, he had many conversations with him. In 1820, especially, he thought his mind as good as ever. Doctor Stevens (who, from his evidence, seems to be a man of sense and observation,) says, that he was acquainted with the testator, from 1815 to within a year of his death: that he was oftener drunk than sober: that in 1819, he was employed by him as a doctor: that he described his disease to him intelligibly and accurately: that he mended afterwards, both in body and. mind; and that, in his last interview with him in 1821, he talked on various subjects, and on all rationally. These physicians, thus concurring, and covering the whole space of time, from the attack to his death, furnish strong evidence of sanity.
Next to physicians, are those who have had the best opportunities of judging; those whose intimacy in the family has given them an opportunity of seeing the patient Si all times, and watching all the operations of his mind. Among these, I will name Mrs. %B.nn-Scott, the widow of the testator’s brother, who had known him for 40 or 50 years, and was always intimate in his family; Miss Ch'ay, in the family eight weeks at a time, seeing him ever)^ hour in the day; Mrs. Goode, a niece, often with him 8 or 10 days at a time; William Taylor, who lived with him six years as oversSEr, beginning with 1810; Roy, a nephew of Mrs. *405 Scott, very intimate and much in the family, also very intelligent, if we may judge from his examination; Cardozo, a Commissioner in Chancery, who took his depositions; Nichols, an old revolutionary croney. These, and many more, give the strongest evidence of the soundness of the testator’s mind.
On the other hand, there are some most respectable witnesses, who did not think him capable of making a will. In the first rank of these, are Smith and Anthony, two attornies, one called in, in 1817, the other, in 1821, to draw wills for Major Scott. They both state that they thought him incapable, and give their reasons. But these gentlemen, however respectable, (and none can be more so) are, I think, overweighed by the two physicians, whose opportunities were better, and who, for the reasons before given, would be considered abler judges in such a case. There are many others on the side of the appellants, whom I shall not particularly notice, but pass them by with this remark; that I have weighed their evidence carefully, and think it clearly overbalanced by that of the witnesses whose opinions are in favor of the capacity of the testator. Thus I think, so far as the opinion of the witnesses is to influence, the will must stand; and to my mind, this conclusion is much strengthened, when we come to consider the various proofs of intelligence and capacity, to be drawn from the acts and conversations of the testator, scattered through the whole space, from 1810 to 1822. I cannot take time, nor is it necessary, to go into a minute examination of the mass of testimony on this branch of the subject. I will merely name some of the witnesses who detail the strongest facts. These are Taylor, Hoy, Robert Scott, Bullock, Cardozo, and the depositions of Major Scott, taken by him, which are filed, and which, I will venture to say, no insane man could have given; and this was Kabler's opinion, the man against whom those depositions operated, and who attended the taking them. There are various other evidences of sanity, to which I *406 will not even refer. On the other hand, many witnesses re]ate trifling and wild conversations, held by the testator, and sometimes actions and conduct, which certainly shew-e<^ a want °f sanity for the time being; such as running away and staying out all night, chasing his servants and throwing his cane at them; shutting himself up in his room, for fear his family should kill him, Skc. But these,, when contrasted with the others, may, I think, be fairly accounted for on the score of intoxication, a habit, in which he is proved constantly to have indulged. Thus, if I were called to decide the case upon the testimony alone, and in the first instance, I should feel compelled to say, that the evidence to prove sanity and capacity was strongest and must preponderate. And this conclusion is greatly strengthened, when I consider that this is a mere question of probate, which, if decided against the appellants, leaves still open 'to them, the question of fraud, by bill in equity; whereas, a decision against the will would close the door to farther investigation; and when too, I reflect, that the County Court, having all the witnesses before them, the magistrates themselves all of the same county, and probably personally acquainted with the testator, have decided that he was of sound mind; and the Superior Court of Law, with the same advantage of viva voce evidence, after a patient hearing, and due consideration, has affirmed the decision. I do not mean to say, that these circumstances abridge our perfect freedom of judgment, or diminish the weight of the obligation on us to correct error where we find it; but I acknowledge they have some influence with me, in a case like this, depending entirely on matter of fact, where truth can be so much more certainly elicited by the examination and cross-examination of witnesses in Court, than by their depositions on paper.
The second point was very properly passed over in the argument, in such a way, as to shew that the counsel did not expect much from it. In truth, there is no evidence of undue influence.
*407 It remains to enquire, whether the Court below erred in excluding the declarations of Mrs. Scott. The writers upon evidence lay it down generally, that the admissions of a party to a suit, against his interest, are evidence in favor of the opposite party; whether made by the real party on record, or by a nominal party, who sues for the benefit of another, or by a party who is really interested in the suit,.though not named in the record. Bauerman v. Radenius, 7 T. R. 664; Hanson v. Parker, 1 Wils. 257; Rex v. Inhabitants of Hardwick, 11 East. 578; 1 Phill. Evid. 74, and other eases cited by him. In my first thoughts upon the subject, this rule seemed to me to comprehend the case at bar; and I was strongly disposed to think, that the declarations of Mrs. Scott, ought to have been received, as she was (though not a party on the record) so directly interested in the cause, that the plaintiffs could not compel her to give evidence. In this view of the ease, one circumstance had escaped me, to wit, that it is part of the question submitted to us, that the declarations of Mrs. Scott, sought to be given in evidence, were made previous to the date of the will, at a time, consequently, when she had, and could have, no interest in the will now attempted to be set aside. The real question then, is this; can the declarations of a person, as to a subject, in which he had no interest at the time, be given in evidence against him, if, by any subsequent event, an interest in the subject should be thrown upon him? I have not been able to find any authority directly on this point. All the cases in which the declarations of a party are said to be evidence against him, shew that he had, at the time of making such declarations, an existing interest. The principle, however, on which his declarations arc made evidence, will, 1 think, decide the question before us. “ The true meaning and sense of the rule, that the declarations of parties may be given in evidence against them, is, the reasonable presumption, that no person will make any declaration against his interest, unless it be founded in truth.” *408 Testing the question by this criterion, the declarations of ]y[rs- Scott, made before the will, cannot be given in evidence; for it is the will which gives existence to her interest. Before its date, she could not know, that she would be left a penny; she could not know that it would not be so written as to oblige her to renounce it, and fly to the law for her support. She had not then, that motive so powerful, as to afford a safe guarantee, that she would make no declaration as to the incapacity of her husband, which was not founded in truth; and her declarations, wanting the essential quality to make them evidence, were properly excluded. I am for affirming the judgment.
Judge Green:
It would be tedious to discuss at large the great mass of evidence in this cause I shall, therefore, content myself with saying, that I am perfectly satisfied, upon the evidence, that Major Scott, at the time he made the will in question, was of sound and disposing mind and memory; and that no undue influence was exercised, to induce him to make his will as he made it.
The only other question in the cause is, whether the Court erred in excluding the evidence offered, of the declarations of Mrs. Scott, as to Major Scott’s state of mind, made by her before he made his will. Except in those cases, in which hearsay evidence is admissible on account of the nature of the subject of enquiry, as in cases of pedigree and boundary, and in questions of prescription, no proof of what another has been heard to say, can be given in evidence; unless to impeach, or support the evidence of the same person, whose declarations are given in evidence; or unless it be the declaration of a party against his own interest, to which confidence is given, from the well founded presumption, that no person will make an admission, operating against his own existing interests, unless it be true. Upon this ground it is, that the admission or con- *409 Sessions of a party to the matter in controversy, or of any one under whom a party to the controversy claims, are proper evidence. And even the admissions of one, who has parted with his interest in the matter in controversy, if made when he had some interest, against which such admissions operated, may, in some cases, be admitted if he be dead. But this is the utmost extent to which the rule, as to the admission of the declarations of one not on oath, has been carried. It cannot be a rule, that the declarations of any one, not on oath, ought to be received in evidence, merely because he cannot be examined because he has acquired an interest in the subject of controversy. If that were true, then the declarations of all persons who are dead, and therefore cannot be examined, should be admitted.
The declarations of Mrs. Scott, offered in evidence, were made at a time when she had no interest, any more than a perfect stranger, in the question whether Major Scott was sane or insane. They cannot, therefore, be received as her admissions against, her interest, nor as hearsay, any more than those of a perfect stranger, who was disabled from giving evidence by death.
I think the evidence was properly excluded, and that the order should be affirmed.
Judges CoAi/rmi and Cabeli, concurred, and the judgment was affirmed.